IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Case No.: 2:23-cr-313-ECM-SMD |
| | ) |
| TOMMY LEE KILLINGSWORTH, JR. | ) |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Defendant Tommy Lee Killingsworth, Jr. ("Killingsworth"), is charged in a one-count indictment with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Indictment (Doc. 1). The three firearms supporting this charge were discovered during a warrantless search of Killingsworth's apartment following his arrest on a state warrant. Killingsworth contends that the search violated his Fourth Amendment rights and moves to suppress the firearms. Mot. (Doc. 29) pp. 1-2. Because Killingsworth consented to the officers' entry into his apartment to retrieve his shoes and the weapons were in plain view, the undersigned recommends that Killingsworth's motion be denied.

**I.   FINDINGS OF FACT**[1]

On April 26, 2023, the United States Marshals Service Gulf Coast Regional Fugitive Task Force ("the Task Force") received a state arrest warrant for Killingsworth from the Montgomery Sheriff's Office.  Tr. (Doc. 33) pp. 3-4.  Killingsworth had been indicted for Robbery in the Third Degree under Alabama law which involves theft through the use of

---

[1] On December 21, 2023, the undersigned held an evidentiary hearing in this matter. The Court reaches findings of fact at an evidentiary hearing based on a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

force or threatened use of force, Ala. Code 1975 § 13A-8-43.  Tr. (Doc. 33) p. 16.  The warrant was assigned to Task Force Officer Abate Desta ("TFO Desta").  He conducted an investigation and determined that Killingsworth was living in Apartment C10, 3441 Audubon Road, Montgomery, Alabama. [2]

The Task Force executed the warrant at Killingsworth's apartment early on the morning of May 1, 2023.  Tr. (Doc. 33) p. 5, 17.  Approximately six officers were on the arrest team.  *Id.*  They set up a perimeter and an entry team with a ballistic shield, a ram, a Halligan tool, and covering officers approached the door. Tr. (Doc. 33) 5, 12.  They knocked, a man inside asked who is it, and officers announced police with a warrant. Tr. (Doc. 33) pp. 4-5, 12-13. They knocked again but heard no further response from inside. Tr. (Doc. 33) pp. 5-6, 12-13.  The officers waited approximately five or six minutes and then breached the door with the battering ram.  *Id.*  They did not enter the apartment but held at the threshold. Tr. (Doc. 33) pp. 6, 13.

Immediately after the officers breached the door, Killingsworth came out of the right hallway, hands first, to surrender.  *Id.*  The officers ordered him to turn around and back out of the apartment.  *Id.*  He complied, and they arrested him outside the door. *Id.*  Shortly thereafter, a second man, who turned out to be Killingworth's guest Shelton Perdue, surrendered in the same manner.  Tr. (Doc. 33) pp. 6, 13, 23.  The officers had expected Killingsworth to be alone in the apartment.  Tr. (Doc. 33) pp. 6-7, 13.

---

[2] The apartment was leased by Killingsworth's sister. Tr. (Doc. 33) p. 5. The Government does not challenge Killingsworth's Fourth Amendment standing to challenge the search, and the undersigned finds that, based on evidence that Killingsworth resided at the apartment, he has shown that he had a legitimate expectation of privacy in the premises sufficient to challenge the search and seizure. *See United States v. Jones*, 184 F. App'x 943, 946-47 (11th Cir. 2006).

Killingsworth was not wearing shoes. Tr. (Doc. 33) pp. 6, 21. He was in bed when the officers arrived and had to quickly get dressed. Tr. (Doc. 33) p. 18. After he was in custody, Killingsworth asked if he could have his shoes. Tr. (Doc. 33) p. 18. Officer Desta asked Killingsworth if he wanted him to retrieve his shoes from inside the apartment, and Killingsworth said yes. Tr. (Doc. 33) p. 7. TFO Desta explained to Killingsworth that if they went into the apartment, they would have to clear the area for any possible threats, and he nodded. Tr. (Doc. 33) pp. 7, 15. The officers did not obtain written consent to search the apartment. Tr. (Doc. 33) pp. 7, 15.

Officer Desta and others entered the apartment to retrieve Killingsworth's shoes. Tr. (Doc. 33) pp. 7, 15. While inside, officers discovered a rifle standing in the corner of an open closet in the master bedroom and a pistol on the shelf above it. Tr. (Doc. 33) pp. 8-11; Gov. Exs. 1, 2. They also found a revolver laying on a pillow on the floor of the adjacent bedroom. *Id.*; Gov. Ex. 3. These weapons were all in plain view and the officers did not open any closets or move any items to find them. *Id.*

## II. APPLICABLE LAW

The Fourth Amendment guarantees the American people's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "[T]he Fourth Amendment has drawn a firm line at the entrance to the house," requiring that the threshold of a home "may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980). However, there are exceptions to this general rule, including when an individual voluntarily consents to a search and when officers are justified in conducting a protective sweep of the premises for their safety.

*McClish v. Nugent*, 483 F.3d 1231, 1240 (11th Cir. 2007). A warrantless search of a home is presumptively unreasonable unless justified by an exception, and the Government bears the heavy burden of demonstrating that an exception applies. *See Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984).

**III.    ANALYSIS**

The Government argues that officers lawfully seized the firearms in Killingsworth's apartment pursuant to the plain-view doctrine. Resp. (Doc. 31) p. 3. "The plain-view doctrine permits the warrantless seizure of an object where an officer is lawfully located in a place from which the seized object could be plainly viewed and lawfully accessed, and the incriminating character of the object is immediately apparent." *United States v. Wren*, 2023 WL 4146439, at *5 (11th Cir. June 23, 2023) (citing *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2009)). Killingsworth does not challenge that the firearms were in plain view or that their incriminating nature was immediately apparent. *See* Mot. (Doc. 29). Instead, Killingworth challenges whether officers were lawfully within his apartment when the firearms were discovered. *Id*. Thus, for purposes of this recommendation, the undersigned finds that the firearms were in plain view and that their incriminating nature was apparent and will examine only whether officers were lawfully inside Killingsworth's apartment when they found them.

The Government contends that officers were lawfully within Killingsworth's apartment pursuant to the protective sweep doctrine and/or because Killingsworth consented to a protective sweep of the apartment. Resp. (Doc. 31) p. 2. The undersigned examines each argument in turn.

4

### A. Protective Sweep Pursuant to Arrest

"Law enforcement officers are permitted, in the context of a valid arrest, to conduct a protective sweep of a residence for officers' safety." *United States v. Yeary*, 740 F.3d 569, 579 (11th Cir. 2014). However, a protective "sweep must be brief and limited to areas from which an attack could be launched." *United States v. Yeary*, 740 F.3d 569, 579 (11th Cir. 2014). During an arrest, officers can, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Maryland v. Buie*, 494 U.S. 325, 334 (1990). But to justify a protective sweep beyond the immediate location of the arrest, officers must have reasonable suspicion "that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 334. "[G]eneralizations, without more, are insufficient to justify a protective sweep." *United States v. Moran Vargas*, 376 F.3d 112, 116 (2d Cir. 2004). Reasonable suspicion is based on "the totality of the circumstances—the whole picture[,]"[3] and "[w]hether or not a Fourth Amendment violation has occurred depends upon objective reasonableness in light of the facts and circumstances."[4]

Here, Killingsworth was arrested outside the door of his apartment where he voluntarily surrendered to officers. Because Killingsworth's bedroom and the adjacent bedroom were not "immediately adjoining the place of arrest," officers were not entitled

---

[3] *United States v. Sokolow*, 490 U.S. 1, 8 (1989) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

[4] *United States v. Hromada*, 49 F.3d 685, 691 (11th Cir. 1995).

5

to enter them to conduct a protective sweep unless they had reasonable suspicion that those areas "harbor[ed] an individual posing a danger to those on the arrest scene." *See Buie*, 494 U.S. at 334.

TFO Desta testified that, based on a conversation with the apartment complex manager, officers believed that Killingsworth was alone in the apartment. TFO Desta indicated that officers were therefore surprised to find Perdue inside the apartment and that they were unsure if others were also inside. But other than the nature of the arrest warrant for Killingsworth, the Government presented no evidence showing that Killingsworth or anyone else inside his apartment posed a danger to officers. Indeed, when asked whether the apartment manager indicated that Killingsworth "was a threat or violent" or that there was "anything violent going on in his apartment," TFO Desta responded "No." Tr. (Doc. 33) p. 14. Under the totality of the circumstances, the fact that Killingsworth was not alone in his apartment is insufficient to create a reasonable suspicion sufficient to protectively sweep the apartment after Killingsworth was arrested and secured outside. Thus, the undersigned finds that officers did not lawfully enter the apartment under the protective sweep doctrine.[5]

---

[5] *See, e.g.*, *United States v. Scott*, 517 F. App'x 647, 649 (11th Cir. 2013) (holding that "[g]iven that [the defendant] was arrested outside of his home, the officer's subsequent protective sweep of his home was not justified under *Buie* absent reasonable suspicion that there were dangerous individuals in the home"); *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999) ("[I]n the absence of specific and articulable facts showing that another individual, who posed a danger to the officers or others, was inside the warehouse, the officers' lack of information cannot justify the warrantless sweep in this case."); *United States v. Archibald*, 589 F.3d 289, 297 (6th Cir. 2009) (adopting the position of several courts that a sweep incident to an arrest made outside the home requires officers to have reasonable suspicion that there is a dangerous individual inside the home).

### B. Consent to Search

Although officers could not lawfully enter Killingsworth's apartment after his arrest simply to perform a protective sweep, the Fourth Amendment inquiry does not end there. Consent provides another exception to the warrant requirement. *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). To be valid, consent must be voluntary meaning "an essentially free and unconstrained choice." *Id*. The Government bears the burden of proving that, based on the totality of the circumstances, consent was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Tovar-Rico*, 61 F.3d 1529, 1536 (11th Cir. 1995).

In addition to being voluntary, the scope of a consensual search must be "confined to the terms of its authorization." *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990). If the scope of a search "exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." *Horton v. California*, 496 U.S. 128, 140 (1990). However, "[a]s in other Fourth Amendment contexts . . . the 'reasonableness inquiry . . . is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

Here, both Killingsworth and TFO Desta testified that Killingsworth asked officers to retrieve his shoes from inside the apartment after his arrest. Tr. (Doc. 33) pp. 6-7, 21. Such a request obviously required officers to enter the apartment, and there is no evidence that Killingsworth was coerced or deceived by officers into making this request. Thus,

7

Killingsworth's choice to have officers enter his apartment to retrieve his shoes constitutes voluntary consent, which excuses the warrant requirement and comports with the Fourth Amendment. *See United States v. Hill*, 795 F. Supp. 2d 1304, 1319 (M.D. Fla. 2011) (finding that, by agreeing to allow an officer to go into his residence to retrieve clothing, the defendant gave consent for officers to re-enter his bedroom for the limited purpose of retrieving those items); *United States v. Bergin*, 732 F. Supp. 2d 1235, 1244-45 (M.D. Fla. 2010) (holding that the defendant's request for an officer to enter his residence to retrieve socks constituted voluntary consent that excused the warrant requirement) (citing *Georgia v. Randolph*, 547 U.S. 103, 109 (2006); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Wright*, 324 F. App'x 800, 803 (11th Cir. 2009)).

However, the timing of Killingsworth's consent in relation to when officers entered the apartment is critical to the Fourth Amendment analysis here. Killingsworth claims that he did not ask for his shoes until approximately an hour and a half after his arrest and that officers had already searched the apartment and discovered the guns before he asked for his shoes. Tr. (Doc. 33) pp. 19-20. In contrast, TFO Desta testified that no officers entered the apartment until Killingsworth asked for his shoes. Tr. (Doc. 33) pp. 6-7, 14. Resolution of this issue requires the undersigned to make a credibility determination as to TFO Desta's and Killingsworth's testimony.

For the following reasons, the undersigned finds TFO Desta's testimony to be credible. TFO Desta consistently testified on both direct and cross that no officers entered the apartment until Killingsworth asked for his shoes. He never wavered in his position and was confident in his testimony. In addition, TFO Desta was forthcoming and honest

8

concerning potential weaknesses in the case, as he readily admitted that Killingsworth did not give verbal or written consent for officers to perform a search or protective sweep and instead merely nodded his head. Finally, the undersigned notes that TFO Desta has no vested interest in the outcome of this case, as he was only responsible for effecting the arrest on the outstanding state warrant. Tr. (Doc. 33) p. 11. This lends additional credibility to his testimony. Overall, TFO Desta's demeanor, tone, manner of testifying, and body language on the witness stand gives the undersigned ample reason to accept his version of events as accurate.

In contrast, the undersigned finds Killingsworth's testimony to be less than credible. Killingsworth testified that officers had him sitting downstairs on the back porch of the apartment for an hour and a half while they searched the apartment. Tr. (Doc. 33) pp. 19-20. However, he admitted that he could not see the front door of the apartment from where he was sitting. *Id.* He then changed his testimony to say that he could see the back door but not inside the apartment. *Id*. at 19-20. Therefore, his testimony that officers entered and searched the apartment is purely conjectural. He did not personally observe this activity. *Id.*

At times, Killingsworth appeared to be unsure, at best, and evasive, at worst, when responding to the questions asked of him. For example, on direct Killingsworth was asked how many officers went inside after he and Perdue were removed. Tr. (Doc. 33) p. 20. Killingsworth answered: "I'm going to say all of them." *Id.* Counsel then attempted to clarify by asking: "Well, some of them had to be with you, didn't they?" *Id.* Killingsworth then changed his testimony to say: "It was like two or three standing like talking to us." *Id.*

9

Killingsworth seemed ready to change his testimony in an apparent effort to bolster his case. Further, the undersigned notes that if the weapons are suppressed, the case against Killingsworth will go away. This gives Killingsworth a powerful incentive to lie about the timing of his request for his shoes. When considering this interest in combination with Killingsworth's demeanor, tone, manner of testifying, and body language, the undersigned finds sufficient reason to reject his version of events.

Having found TFO Desta's testimony credible and Killingsworth's not credible, the undersigned concludes that, based on a preponderance of the evidence, officers did not enter Killingsworth's apartment until he had given them permission to retrieve his shoes. Thus, the undersigned finds that officers were lawfully within the apartment based on Killingsworth's voluntary consent. But in addition to the timing of Killingsworth's consent, the undersigned must also examine whether the scope of officers' entry was "confined to the terms of [Killingsworth's] authorization." *See Strickland*, 902 F.2d at 941. The Government argues that, by the nod of his head, Killingsworth gave officers consent to perform a protective sweep of his apartment, to include his bedroom and the adjacent bedroom. Killingsworth, on the other hand, argues that he gave no such consent.

While the undersigned has no reason to doubt TFO Desta's testimony that he observed Killingsworth nod his head when asked whether officers could perform a protective sweep to retrieve his shoes, the undersigned does not find that Killingsworth's head nod equated to his consent to a protective sweep. Indeed, a mere head nod could simply indicate that Killingsworth was listening to and understanding TFO Desta's conversation; it does not necessarily mean that Killingsworth gave consent for officers to

10

sweep his apartment. And in light of Killingsworth's testimony that he did not give such consent, the undersigned affords Killingsworth the benefit of the doubt and finds that the scope of his consent was limited to retrieval of his shoes.

Under that scope, it was reasonable for officers to enter Killingsworth's bedroom to search for his shoes. While there, officers observed—in plain view—a rifle and a handgun in Killingsworth's open closet, which were then lawfully seized pursuant to the plain-view doctrine. But under that same scope, the search of the adjacent bedroom is problematic. Notably, the Government has presented no evidence that officers were looking for Killingsworth's shoes in the adjacent bedroom or that Killingsworth advised officers that his shoes could be found there. Further, there is no evidence that officers were required to pass through the adjacent bedroom in order to enter Killingsworth's bedroom. Thus, without evidence indicating that officers were reasonably justified in entering the adjacent bedroom to search for Killingsworth's shoes, the undersigned finds that entry into the same exceeded Killingsworth's consent.

Nonetheless, if officers were lawfully in the adjacent bedroom for another reason, the firearm found there could still be seized pursuant to the plain-view doctrine. Some courts have found that the protective sweep doctrine, while explicitly articulated by the *Buie* Court in terms of an arrest, is applicable to other analogous circumstances. *See United States v. Rudaj*, 390 F. Supp. 2d 395, 403 (S.D.N.Y. 2005). In other words, while *Buie* frames the protective sweep standard in terms of an arrest, it "gives no indication that circumstances other than arrest which expose police officers to a comparable danger could not also justify a similar protective response[.]" *United States v. Gould*, 364 F.3d 578, 581

(5th Cir. 2004); *see also United States v. Knights*, 534 U.S. 112, 117 (2001) (criticizing as "dubious logic" the argument "than an opinion upholding the constitutionality of a particular search implicitly holds unconstitutional any search that is not like it").

The undersigned holds that the interests at stake here when the officers entered the apartment to retrieve Killingsworth's shoes are essentially identical to those recognized in *Buie*. The officers here had the same interest "in taking steps to assure themselves that the house . . . is not harboring other persons who are dangerous and who could unexpectedly launch an attack" as the arresting officers in *Buie*. 494 U.S. at 333. Therefore, *Buie* extends to the situation here where officers entered a residence to retrieve a subject's clothing. The officers were justified in sweeping the adjacent bedroom for threats to their safety when they went to the master bedroom to get Killingsworth's shoes. Thus, the revolver in plain view on the bedroom floor was lawfully discovered and seized.

## IV. CONCLUSION

For these reasons, the undersigned RECOMMENDS that Killingsworth's Motion to Suppress (Doc. 29) be DENIED in its entirety. Further, it is

ORDERED that the parties shall file any objections to this Recommendation **on or before January 16, 2024**.[6] A party must specifically identify the factual findings and legal

---

[6] Due to the current timing of trial, the undersigned shortens the usual period for filing objections to afford the District Judge sufficient time to resolve any objections. *See United States v. Williams*, 2016 WL 304320, at *1 (M.D. Ala. 2016) (adopting the magistrate judge's recommendation pertaining to the defendant's motion to suppress with a shortened objections period due to exigent circumstances); *Sabal Trail Transmission, LLC. v. 7.72 Acres In Lee Cty., Ala.*, 2016 WL 10789585, at *1 (M.D. Ala. 2016) ("where exigencies exist, a court may shorten the time for filing objections."); *Esco Marine, Inc. v. SS Pacific Star*, 2011 WL 5026192 at *1, n.1 (E.D. Cal. Oct 21, 2011) (shortening the time period for objections because "exigencies of the calendar require[d]" it) (quoting *United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978), *cert. denied*, 435 U.S. 955 (1978) (holding that trial court did not err in providing parties less than

conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered. Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH CIR. R. 3-1. *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 5th day of January, 2024.

Stephen M. Doyle
CHIEF U.S. MAGISTRATE JUDGE

---

the [then-applicable] full ten-day period to file objections to the magistrate judge's report and recommendation where exigencies existed, stating that the ten-day objections period constituted a "maximum, not a minimum.")).